IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | CRIMINAL NO. 2:25-362-RMG |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **JEROME SYDNEY HEYWARD** | ) | |
| | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

On February 28, 2025, the Defendant, Jerome Sydney Heyward, pleaded guilty to a fourteen-count Information charging: Attempted Extortion Under Color of Official Right, in violation of 18 U.S.C. § 1951(a) (Count 1); Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1346 (Counts 2, 3, 6 and 11); Conspiracy to Commit Bribery with Respect to Programs Receiving Federal Funds and Honest Services Wire Fraud, in violation of 18 U.S.C. § 371 (Counts 4 and 7); Bribery with Respect to Programs Receiving Federal Funds, in violation of 18 U.S.C. §§ 666(a)(1)(B), (b), and 2 (Counts 5, 9, and 10); Theft with Respect to Programs Receiving Federal Funds, in violation of 18 U.S.C. §§ 666(a)(1)(A), (b), and 2 (Count 8); and Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (Counts 12-14). The United States Probation Office prepared a presentence report ("PSR") outlining a total offense level 32 and a criminal history category of I, resulting in an advisory guideline range of 121-151 months. Heyward is scheduled to be sentenced by this Court on June 30, 2026, at 10:00 a.m.

When confronted by law enforcement, Heyward took full responsibility for his actions ███ ████████████████████████████████████████████████ ██████████████████████████████████████ Nevertheless, given the extent of Heyward's corrupt

1

exploitation of his position of public trust, a term of imprisonment between 87 to 108 months is sufficient but not greater than necessary to achieve the purposes of sentencing.

## I.     Sentencing Factors

Title 18 U.S.C. § 3553(a) sets forth the sentencing factors that a court must consider in fashioning a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing. Those factors include the nature and circumstances of the offense, history and characteristics of the defendant, the needs for the sentence to promote respect for the law, provide just punishment, and afford adequate deterrence, and protect the public from future crimes of the defendant. The Government respectfully submits that a weighing of the sentencing factors supports a guideline sentence.

### A.  Nature and Circumstances of the Offenses

In February 2024, the FBI was notified by a citizen that Heyward, an elected councilmember for the City of North Charleston, approached the citizen with an offer to help resolve a variety of disputes with the city. PSR ¶ 18. Thereafter, the FBI engaged the citizen as a source and launched a large-scale public corruption investigation of City of North Charleston officials and community members involved in extortion, bribery, honest services wire fraud, and money laundering. *Id.*

Heyward was the main target of the investigation. *Id.* at ¶ 19. Heyward represented District 5 and was first elected to City Council in 2019 and then reelected in 2023. *Id.* Before his election to City Council, Heyward held himself out as a lobbyist/consultant who peddled influence with local and state governments and agencies. *Id.*

During the course of the investigation, the FBI utilized its source to make consensually recorded phone calls and attend meetings with Heyward. *Id.* at ¶ 20. Thereafter, the FBI obtained

court-authorization to initiate a wiretap over Heyward's cellular telephone. *Id.* Interceptions began in mid-April 2024 and lasted until early July 2024. *Id.*

During the interception of Heyward's telephone, investigators uncovered several other bribery and fraud schemes, most of which involved Heyward's use of his position as an elected councilmember with the City of North Charleston to influence decisions in which Heyward had a financial interest. *Id.* at ¶ 20. The various schemes included Heyward's efforts to use his position to accept payment from a local businessman in exchange for his assistance in zoning and licensing matters (The Extortion Scheme), an effort to construct a boat manufacturing plant on a piece of property in the city (The Sea Fox Scheme), and the disbursement of city funds to non-profits tasked with reducing violent crime in the city (The Gun Violence Non-Profits Scheme). *Id.*

### i. The Extortion Scheme – Counts 1 through 3

The citizen who approached the FBI operates several businesses within the City of North Charleston. *Id.* at ¶ 22. Several of the businesses have been cited for issues related to activities occurring on the business' premises, including alleged violations of city ordinances. *Id.* In early 2024, Heyward asked the businessman to meet him at a restaurant in North Charleston. *Id.* at ¶ 24. Heyward claimed to have sufficient influence over other elected officials either to pressure the City to resolve the disputes in the businessman's favor or take other action in favor of the businessman, such as rezoning the properties. *Id.* Heyward presented the businessman with a "Consulting Contract" purporting to engage Heyward as a consultant on behalf of the businessman and his primary holding company. *Id.* The proposed contract set forth that among the entities that Heyward would "lobby" was the City of North Charleston. *Id.* In exchange, the businessman would pay Heyward $10,000 up front and then $7500 per month for the duration of the contract. *Id.*

3

The businessman approached the FBI with the Consulting Contract and thereafter became an FBI source. *Id.* at ¶ 25. On February 29, 2024, the businessman met Heyward at Longhorn Steakhouse. *Id.* The meeting was consensually recorded by the FBI. *Id.*

During the meeting, the businessman negotiated the monthly prices for Heyward's "consulting" services from $7,500 to $5,000 a month. *Id.* Heyward claimed to have control over Council, specifically seven councilmembers. *Id.* at ¶ 26. When asked about potential opposition to the changes the businessman sought, Heyward stated "He'll be outvoted. Anything we need to vote on, we'll just run over him." *Id.* He assured the businessman that he would get results, including changing zoning overlays on the businessman's property. *Id.* When the businessman expressed concerns that he would pay Heyward but nothing happens, Heyward stated:

> Well, the way I always tell people is, you don't know until you try. I think the position I'm in is about as strong as anything. I mean, Reggie [the mayor] need me more that I need him. He can be railroaded. I approve his budget. You know I got the votes, I recruited all the candidates so, I'll go to him, if I have to, and say look, either you gonna help us or put it on the agenda. Plain and simple. I hope I don't have to go that route, but if I have to, I'm not adverse to putting anything on the agenda.

*Id.* Heyward agreed to arrange and attend meetings with other City officials, including employees that work in the building and permitting department and the City attorney. *Id.* at ¶ 27.

Thereafter, Heyward sent the businessman wire instructions to wire the funds to Heyward's account. *Id.* at ¶ 28. FBI arranged for FBI funds to be given to the businessman to wire to Heyward. *Id.* On March 11, 2024, the businessman wired Heyward $15,000 in FBI funds—a $10,000 retainer and the $5,000 monthly fee. *Id.* On April 5, 2024, the businessman wired Heyward an additional $5,000 in FBI funds. *Id.*

In the Spring 2024, the City's Special Assistant of Development approached the Deputy Director of Planning and Zoning, indicating that Heyward wanted to set up a meeting with the

4

businessman. *Id.* at ¶ 29. On April 25, 2024, Heyward arranged a meeting with him, the businessman, and employees of the North Charleston building and permitting department. *Id.* During the meeting, Heyward advocated on the businessman's behalf and requested that the City employees help the businessman out. *Id.* Heyward never disclosed that he had a financial interest in the businessman's issues.

On April 26, 2024, Heyward arranged a meeting with him, the businessman, and a North Charleston City employee at one of the businessman's properties. *Id.* at ¶ 30. The purpose of the meeting was to discuss a property swap with the businessman to resolve all of his disputes with North Charleston. *Id.* According to the employee, Heyward requested his assistance for the businessman and asked him to assist the businessman with the re-zoning process and to work with city staff to accomplish the rezoning. *Id.* Heyward never disclosed his financial interest or that the businessman was paying him to advocate on his behalf. *Id.*

FBI intercepted numerous calls between Heyward and North Charleston employees in which Heyward arranged the meetings and asked for assistance. *Id.* at ¶ 31. The employees found Heyward's conduct very strange because the businessman's properties were not in Heyward's district, and it was not common for councilmembers to advocate in this way. *Id.* This conduct led to the extortion and honest services wire fraud charges in Counts 1 through 3.

### ii.     Sea Fox Boats Scheme – Counts 4 through 6

In 2022, the Charleston County Parks and Recreation Commission ("CCPRC") requested proposals for the development of a tract of land in Charleston County known as the Baker Hospital Site ("BHS"). PSR ¶ 32. After reviewing several proposals, CCRPC selected a proposal put forward by Sea Fox Boats Inc. ("Sea Fox"), a boat manufacturing company. *Id.* The Sea Fox proposal included both a boat manufacturing plant on a portion of the overall BHS and a public

park with access to the adjacent Ashley River. *Id.* Because the Sea Fox proposal included uses that were not compliant with existing zoning, CCPRC applied for a change in the applicable zoning. *Id.* at ¶ 33. Although the BHS is located within Charleston County and the site was owned and controlled by CCPRC, the BHS is also located in the City of North Charleston and thus subject to North Charleston's zoning regime. *Id.* The zoning change required approval from North Charleston City Council. *Id.*

North Charleston's City Council is comprised of ten districts, with each district electing a representative to serve on City Council. *Id.* at ¶ 35. The full slate of councilmembers, along with the City's mayor, are elected every four years in a non-partisan election. *Id.* The proposed Sea Fox project was very controversial and drew strong opposition from the community. *Id.* While some council members, including Heyward, were supporters of the Sea Fox proposal, others were stringently opposed. *Id.* Mike A. Brown, former councilman representing District 1, also supported the project.

To overcome the opposition, Sea Fox engaged two "consultants" to help garner support amongst councilmembers and the community, including Aaron Hicks. *Id.* at ¶ 37. Hicks is Brown's close family friend and Heyward's associate. *Id.* Although Hicks had never worked as a consultant, Heyward and Brown recommended that Sea Fox hire him to help the project succeed. *Id.* Sea Fox originally agreed to pay Hicks $10,000 per month for February and April 2024. *Id.*

In February 2024, on behalf of Sea Fox, CCPRC applied to rezone the BHS. *Id.* at ¶ 38. North Charleston's planning commission reviewed CCPRC's application in March 2023, unanimously recommending that City Council deny CCPRC's application. *Id.* Following the planning commission's review of the application and its recommendation that it be denied, the

application was scheduled to come before City Council's Public Safety Committee[1] for a first reading. *Id.* The meeting was scheduled for April 18, 2024. *Id.*

FBI began intercepting Heyward's calls on April 17, the day before Sea Fox's proposal was scheduled to come before City Council for the first reading. *Id.* at ¶ 39. FBI intercepted a series of calls between Heyward, Brown, Hicks, other members of City Council, and representatives of Sea Fox during which the planned vote on the evening of April 18 and related issues were discussed. *Id.*

During the evening hours of April 17, Brown called Heyward and the two discussed the Sea Fox proposal. *Id.* at ¶ 40. The two men were concerned that they did not have the votes lined up to advance CCPRC's zoning application. *Id.* Around 10:41 a.m. on April 18, Brown called Heyward and asked if Heyward had spoken to a Sea Fox employee. *Id.* After asking if Heyward had heard from the employee, Brown stated, "Shit, I really depending on getting this thing so I can help Michael do some stuff, man." *Id.* Heyward offered to call the employee, and Brown responded, "Yeah, call [him]. Cuz Hicks ain't got no urgency. You know, with him, you know what I'm saying? He probably don't give a fuck." *Id.* Brown then stated, "Mike literally just called me yesterday with some stuff that he falling on. I told him I'm gonna help him out. Shit, this free money." *Id.* Brown's son, Mike Jr., was getting married that weekend, and Brown was having trouble covering expenses related to the wedding events. *Id.* at ¶ 41. Heyward then reiterated that he would call the employee. *Id.* at ¶ 40.

At 10:48 a.m. on April 18, Heyward called the Sea Fox employee to discuss the upcoming vote. *Id.* at ¶ 42. At 11:48 a.m., Heyward received a call from Hicks. *Id.* at ¶ 43. Hicks stated that

---

[1] All ten City Council members sit on the Public Safety Committee; thus, the Public Safety Committee's meetings are, for all intents and purposes, full City Council meetings.

"[the Sea Fox owner] acts like he's dodging me" and that "[the Sea Fox employee] ain't hit me back or nothing yet." *Id.* Hicks then stated, "At the same time, I'm trying to make sure it goes through, but they won't trying to do right by me." *Id.* Heyward then advised that Hicks should call the Sea Fox employee. *Id.* Hicks claimed to have already made numerous calls to Sea Fox employees. *Id.* Hicks then stated, "I've been trying to get that squared away before the vote happens tonight." *Id.* After again encouraging Hicks to contact Sea Fox about receiving a check, Heyward stated,

> Yeah, Mike just called me and he tried to do some last-minute stuff for his son and he asked me if I heard from you and I said I ring you earlier to check on things but I hadn't heard back from you. He said man you gotta help me I got some last-minute stuff I gotta do.

*Id.* Hicks promised to call Sea Fox again, and then Heyward stated that if that did not work, he would call and tell the employee to "square away with the man." *Id.*

At 4:25 p.m.—an hour before the Public Safety Meeting during which City Council would vote on forwarding CCPRC's zoning application to the next City Council meeting for a vote— Hicks called Heyward. *Id.* at ¶ 45. During the call, Hicks told Heyward, "I was calling you earlier, before I go into work, to let you know I got your money." *Id.* Hicks then told Heyward that he wanted to meet him before they entered North Charleston City Hall: "I didn't want to nobody to see me talking once you had got here." *Id.*

Through interviews with Heyward, Brown, Hicks, and others, agents established that Heyward, Brown, and Hicks entered into an agreement for Hicks to pay a portion of his fee from Sea Fox to Heyward and Brown in exchange for their support of the BHS rezoning. *Id.* at ¶ 46. Hicks' initial agreement with Sea Fox called for two $10,000 payments, one for March 2024 and one for April 2024, in exchange for Hicks' help in the community. *Id.* Hicks received the first

8

$10,000 payment in late February 2024. *Id.* At the beginning of April 2024, Hicks picked up a check from Sea Fox for $5,000. *Id.*

During an interview with agents, Hicks stated that Heyward offered to help Hicks learn how to act as a consultant and would also continue to support the Sea Fox project. *Id.* at ¶ 47. Hicks understood that the success of the Sea Fox project—his first consulting deal—would strongly impact his future success as a consultant. *Id.* Heyward's continued support of the project was necessary. *Id.* In exchange for his help, Hicks agreed to pay Heyward a portion of the money he received from Sea Fox, and from the first $10,000 payment from Sea Fox, Hicks paid Heyward $2,500. *Id.*

Hicks is also close friends with Brown. *Id.* at ¶ 49–50. Based on conversations between Heyward and Brown, Hicks knew that Brown needed money and expected to be paid a portion of Hicks' fees from Sea Fox. *Id.* Hicks received a second $5,000 check on April 18, the day of the vote. *Id.* Hicks told agents that he cashed the check and gave a portion to Brown and Heyward. *Id.*

During interviews with agents, Heyward corroborated Hicks' statement concerning an agreement that Heyward and Brown would receive a kickback from Hicks' fees. *Id.* at ¶ 50. Heyward stated that nobody at Sea Fox was aware of their agreement, and at no point prior to the April 18 vote did Heyward directly ask Sea Fox for a payment. *Id.* Instead, they relied on Sea Fox's arrangement with Hicks for their kickbacks. *Id.*

Ultimately, the April 18 vote to advance CCPRC's rezoning application did not occur. As City Council moved to discuss the proposal, a council member moved to table the matter and delay the first reading, and the move was seconded by another council member.

During a call on May 16, Heyward and Hicks discussed whether they had options moving forward on the Sea Fox proposal. *Id.* at ¶ 60. Realizing that they likely did not have the votes to

pass the measure, but wanting to continue pushing the project, Heyward suggested that they look at other sites in the city. *Id.* Hicks said, "Let me ask you this, Jerome. *Id.* This is how we eat on the back side in my mind, if we either pull that off, . . . and I keep that deal with [Sea Fox] like I work out, he keeps me on board and then I set my price and we continue to eat, right?" Heyward responded, "Yeah, if we win tonight." *Id.* Hicks then clarified that he was thinking about how they would be able to extort Sea Fox further if the vote fails but Sea Fox continues to pursue the project. *Id.* Heyward then affirmed that he understood Hicks' point. *Id.* Hicks then stated, "So, if you want me to keep working on this, this what my price gonna be. This is what I'm gonna need." *Id.* The two then joked that they wished they had thought of this sooner. *Id.*

### iii.     Non-Profit Scheme – Counts 7 through 14

In the spring of 2022, the City of North Charleston decided to give funds to non-profits with the goal of reducing violence in the community. *Id.* at ¶ 62. The city created a committee to review and then select the non-profits that would be receiving city funds. *Id.* After reviewing the applicants, the committee recommended 13 groups, with each group receiving an equal share of the $1,300,000 in funds the City intended to distribute. *Id.*

Two of the recipients—DEEP SC and Core4Success—had close ties to Heyward. *Id.* at ¶ 63. DEEP's executive assistant was Michelle Stent-Hilton, Heyward's personal assistant. *Id.* Donovan Moten, Heyward's close friend and business partner, founded Core4Success. *Id.* In exchange for his support of their nonprofits, Moten and Stent-Hilton agreed to pay Heyward 20% of whatever money they received from North Charleston. *Id.* at 64. In December 2022, the matter—that is, whether to allocate $1.3 million in City funds to the 13 non-profits, including DEEP and Core4Success—was brought before North Charleston's City Council for approval. *Id.*

10

City Council minutes show that the resolution received unanimous support from Council and that Heyward was present at the meeting and tendered a vote. *Id.*

Heyward enlisted Rose Lorenzo, a bookkeeper from North Carolina, to manage the books for DEEP and Core4Success. *Id.* at 65. At Heyward's direction, Stent-Hilton and Moten agreed to send their kickbacks to Heyward through Lorenzo as a way to disguise and conceal the payments. *Id.* In December 2022, Lorenzo received two $20,000 checks from DEEP and Core4Success. *Id.* Upon receiving the checks from the non-profits and depositing each into her account, Lorenzo wired $40,000 to Heyward's Wells Fargo checking account. *Id.*

In April 2024, while agents were intercepting Heyward's cellular telephone, a call between Heyward and Moten was intercepted. *Id.* at 67. During the call, Heyward discussed the possibility that North Charleston would be distributing additional funds to non-profits. *Id.* Heyward proposed that if North Charleston distributed $120,000 to Core4Success, half of that payment would go to Moten and half would go to Heyward. *Id.*

### iv.     The nature and circumstances of the offenses described above warrant a significant term of imprisonment.

Heyward's widespread use of his position of public trust to extort constituents, solicit bribes, accept kickbacks, and steal taxpayer funds was egregious. Heyward's crimes were prolific. Under the guise of advocating for the public's legitimate interests, Heyward truly only advocated for himself. During the two-month period that FBI intercepted Heyward's cellphone, he spent countless hours each day talking to other public officials and agents, community leaders, law enforcement, and citizens scheming for ways to use his official position to make more money. Heyward was lured by the temptations of power, influence, and greed, and he wielded that power and influence at every opportunity.

Heyward was the ultimate "pay to play" politician. He created the impression that he controlled North Charleston City Council. And often, perception becomes reality. Heyward leveraged that perception to pad his own pockets, depriving the citizens of North Charleston of the honest services they were owed. The significance of these offenses warrants an equally significant sentence.

**B. Heyward's history and characteristics warrant a guideline sentence.**

Heyward, like most of his codefendants and other public officials that appear for sentencing in federal court, does not have a criminal history. Heyward is a father, brother, and son who is actively engaged in his community.

Heyward has taken full responsibility for his crimes, cooperated with the government, and done everything he can do to better himself and his situation. While his community and family ties and efforts at rehabilitation are commendable, they do not outweigh the severity of his crimes or the need for the sentence imposed to promote respect for the law, provide just punishment, and deter criminal conduct. Therefore, his history and characteristics weigh in favor of a sentence within the government's proposed range.

**C. A significant sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct.**

A significant prison sentence is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence. Heyward exploited his position as a public official for his own personal enrichment, undermining the public's trust in its leaders and its system of governance. When public officials exploit those positions of power and public trust, they must be held accountable. A sentence within the government's recommended range will deter other public officials from engaging in similar conduct.

### D. Conclusion

For the reasons set forth above, sentence between 87 to 109 months is sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By: s/ *Emily Limehouse*
Emily Limehouse (Fed. Id. 12300)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
843-266-1663
Emily.Limehouse@usdoj.gov

June 26, 2026